**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOHN DOES 172-191, AND
JANE DOE 1

                Plaintiffs,

    v.

THE OHIO STATE UNIVERSITY,

                Defendant.

Case No. 2:21-cv-2121

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs John Does 172-191 and Jane Doe 1 file this Complaint against Defendant, The Ohio State University ("OSU" or the "University"). This is a companion case to ten settled cases: ***Michael DiSabato and John Does 1-36 v. The Ohio State University*, Case No. 2:19-cv-02237; *John Does 37-66 v. The Ohio State University*, Case No. 03165; *John Does 67-88 v. The Ohio State University, Case No. 04397; *John Does 88-94 v. The Ohio State University*, Case No. 04624; *Dave Beaudin, Mathew Barclay and John Does 95-136 v. The Ohio State University*, Case No. 04634; *Derek de Jong and John Does 137-139 v. The Ohio State University*, Case No. 05551, *John Does 140-150 v. The Ohio State University,* Case No. 01188, *John Doe 32 v. The Ohio State University,* Case No. 02008, *John Does 151-166 v. The Ohio State University,* Case No. 03817, and *John Does 167-171 v. The Ohio State University,* Case No. 03817.** This case is also related to case ***John Doe 162 v. The Ohio State University,* Case No. 03817,** which has not settled and remains active, and ***Alonzo Shavers and Kenneth McHone v. The Ohio State University,* Case No. 02120**. As of April 17, 2020, the date of this Court's

Order, ECF No. 151, 2-18-cv-692, none of these Plaintiffs were filed. Plaintiffs are filing this case separately because these are new Plaintiffs to the litigation.

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

## PRELIMINARY STATEMENT

3.      Plaintiffs bring this civil rights lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty member, and the Associate Director of OSU's sports medicine program, sexually assaulted and abused hundreds of OSU student-athletes and other OSU undergraduates throughout his almost twenty-year career with the University. OSU officials not only had actual notice of Strauss' criminal and unlawful actions, they aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.      As a threshold matter, Plaintiffs admit they consented to receiving medical treatment while student-athletes at OSU. Plaintiffs, however, did not consent to Strauss doing or saying anything that was medically unwarranted, inappropriate, or unethical. For numerous

reasons described below, Plaintiffs were not in a position to judge Strauss' clinical practices or to avoid him when seeking medical care.

5.       Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, and swimming.

6.       On information and belief, OSU assigned Strauss a locker in *every room* used by athletes for the teams based in Larkins Hall.

7.       Strauss also used his access to students to sexually assault/abuse students that were not part of intercollegiate sports.

8.       OSU designated Strauss as a team physician for many sports. Student-athletes could not avoid him if they wanted medical treatment. OSU funneled Plaintiffs and other student-athletes to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

9.       OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his patients. A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss. "In her view, individuals who overlapped with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p.

104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; athletes' openly commented on the fact that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and requested (and received) multiple lockers in Larkins Hall.

10.     There were other clear signs of Strauss' predatory behavior. When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the physical. Strauss always chose to man the "hernia check" station.  He took an extended amount of time with each athlete patient and examined each patient in a room with the door closed. Strauss' "hernia checks" frequently took several minutes. Some lasted as long as ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations for their physicals and anxiously waited for Strauss to exam them.  Strauss' prolonged genital exams were well-known to the athletes he examined, Athletics Department personnel, and team coaches. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals because his athletes complained so much about Strauss' methods.

11.     Strauss disguised his sexual assaults in the context of medical examinations.  He frequently positioned Plaintiffs so that his face was at the same height as their crotches. Strauss placed his face so close to his patients that they could feel his breath on their genitals.  Other times he had them sit on a bench and spread their legs; he would then roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam.  Sometimes

Strauss donned a headlamp and turned off the room lights before putting his head inches away from patients' penises. When Plaintiffs asked Strauss why such in-depth and lengthy genital inspections were necessary, or why he was massaging their genitals, probing their rectums, or doing or saying other harassing and inappropriate things, Strauss came up with many different medical explanations. Hernia and lymph node checks were a common explanation.  When one Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

12.    Strauss also sexually assaulted students by performing anal and rectal exams that were rigorous, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating to the Plaintiffs who endured them. Numerous Plaintiffs were assaulted in this manner.

13.    Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal; Strauss did things his way; Strauss was just being thorough; and/or this had gone on for years.  Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a  necessary part of their participation in intercollegiate athletics that was like a "hazing."

14.    In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP conducted its investigation and issued the Report on May 15, 2019.  Plaintiffs were not aware and had no reason to know of the sexual assaults and abusive conduct by Dr. Strauss and the widespread institutional knowledge giving rise to their

causes of action until the report was publicly published. The Report substantiates many of the allegations made by Plaintiffs in this case and in other Title IX cases presently pending before this Court.[1] *See, e.g., Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00735-MHW-EPD.

15.     John Does 172-191 and Jane Doe 1 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

16.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning, and a majority of the Plaintiffs love OSU dearly and remain devoted members of The Buckeye Nation.

17.     Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

18.     Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

19.     Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

20.     Team physicians hold a special relationship of trust and confidence with the student-athletes they treat.

21.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty.

---

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

22.     Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

23.     Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

24.     Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

25.     Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood the Plaintiffs or other student-athletes were being sexually assaulted, abused, or harassed by Strauss and/or by conditions at Larkins Hall.

26.     Plaintiffs expected OSU, an esteemed institution of higher learning, to investigate the truth about Strauss' conduct in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletics programs.

27.     Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other OSU students.

28.     Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

29.     OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students.  At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to

disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing many OSU athletes he treated.

30.     On information and belief, OSU personnel who failed to implement corrective measures despite having actual knowledge of: (a) the risk that Strauss was sexually assaulting students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

31.     At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of athletes at the University.  This culture led to OSU's active concealment of and deliberate indifference towards continuous complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for approximately twenty years.

32.     Only within the past two years have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

33.     Only within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student-athletes he treated.

34.     Only within the past two years have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

35.     Only within the past two years have the Plaintiffs had reason to know that OSU administrators in a position to take corrective measures knew about sexually harassing environment that students and athletes endured each day in Larkins Hall.

36.     Even if Plaintiffs had realized more than two years ago that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU harmed them separately and independently from the harm that Strauss inflicted on them.  Strauss harmed Plaintiffs by sexually assaulting and abusing them. OSU separately and independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator.  Not until within the past two years would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

37.     Likewise, not until within the past two years would the Plaintiffs whose teams practiced in Larkins Hall have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

<u>THE PARTIES</u>

38.     Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

39.     Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

40.     Most Plaintiffs were enrolled at OSU as students during Strauss' employment with OSU.

41.     Most Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

42.     Plaintiffs received financial assistance from OSU. Most financial assistance was linked to their participation on OSU's intercollegiate sports teams.

43.     Plaintiff John Doe 172 is a resident of the State of Indiana.

44.     Plaintiff John Doe 172 attended OSU from 1980-1984 and was a member of the football team for 4 years and the wrestling team for 3 years while he attended OSU.

45.     Strauss treated John Doe 172 approximately 1 time while John Doe 172 was a student athlete at OSU. Strauss sexually assaulted/abused John Doe 172 at least 1 time. Strauss sexually assaulted/abused John Doe 172 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 172's genitals in a manner that made John Doe 172 feel very uncomfortable. The exam involved Strauss trying to arouse John Doe 172.

46.     John Doe 172 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 172 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 172. And John Doe 172 was raised to believe that doctors help their patients, not hurt them.

47.     Before May 15, 2019, John Doe 172 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 172 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 172 on notice that Strauss was a sexual predator.

48.     Before May 15, 2019, John Doe 172 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

49.     After May 15, 2019, John Doe 172 learned that Strauss' examination in which Strauss manipulated John Doe 172' genitals was medically unwarranted, improper, and even criminal. John Doe 172 also learned that Strauss was a serial sexual offender. Then John Doe 172 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

50.     OSU showed more than deliberate indifference by placing John Doe 172 under Strauss' care. OSU betrayed John Doe 172 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 172 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

51.     Plaintiff John Doe 173 is a resident of the State of California.

52.     Plaintiff John Doe 173 attended OSU from 1988-1992 and was a member of the wrestling team for 4 years while he attended OSU.

53.     Strauss treated John Doe 173 approximately 3 times while John Doe 173 was a student athlete on the wrestling team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 173 every time. Strauss sexually assaulted/abused John Doe 173 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 173's genitals in a manner that made John Doe 173 feel very uncomfortable.

54. John Doe 173 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 173. Strauss would also shower with the team and watch the other men in the shower.

55. John Doe 173 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 173 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 173. And John Doe 173 was raised to believe that doctors help their patients, not hurt them.

56. Before May 15, 2019, John Doe 173 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 173 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 173 on notice that Strauss was a sexual predator.

57. Before May 15, 2019, John Doe 173 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

58. After May 15, 2019, John Doe 173 learned that Strauss' examinations in which Strauss manipulated John Doe 173's genitals were medically unwarranted, improper, and even criminal. John Doe 173 also learned that Strauss was a serial sexual offender. Then John Doe 173 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

59. OSU showed more than deliberate indifference by placing John Doe 173 under Strauss' care. OSU betrayed John Doe 173 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 173 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

60.     Plaintiff John Doe 174 is a resident of the State of Ohio.

61.     Plaintiff John Doe 174 attended OSU from 1980-1984 and again from 2007-2009. He was a member of the football team for 4 years while he attended OSU in the 1980s.

62.     Strauss treated John Doe 174 approximately 1 time while John Doe 174 was a student athlete on the football team at OSU. Strauss sexually assaulted/abused John Doe 174 1 time. Strauss sexually assaulted/abused John Doe 174 by performing a rectal exam where he digitally penetrated John Doe 174 under the guise of a prostate exam. Strauss also conducted a long genital exam where Strauss massaged his groin and worked his hands up to his crotch where he excessively fondled and moved his hands around John Doe 174's penis and testicles. Both acts were done in a manner that made John Doe 174 feel very uncomfortable. The exam involved Strauss trying to arouse John Doe 174.

63.     John Doe 174 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 174 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 174. And John Doe 174 was raised to believe that doctors help their patients, not hurt them.

64.     Before May 15, 2019, John Doe 174 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 174 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 174 on notice that Strauss was a sexual predator.

65.     Before May 15, 2019, John Doe 174 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

66.     After May 15, 2019, John Doe 174 learned that Strauss' examination in which Strauss manipulated John Doe 174's genitals and digitally penetrated him was medically unwarranted, improper, and even criminal. John Doe 174 also learned that Strauss was a serial sexual offender. Then John Doe 174 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

67.     OSU showed more than deliberate indifference by placing John Doe 174 under Strauss' care. OSU betrayed John Doe 174 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 174 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

68.     Plaintiff John Doe 175 is a resident of the State of Florida.

69.     Plaintiff John Doe 175 attended OSU from 1980-1983 and was a member of the football team for 3 years while he attended OSU.

70.     Strauss treated John Doe 175 approximately 3 times while John Doe 175 was a student athlete on the football team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 175 2 times. Strauss sexually assaulted/abused John Doe 175 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 175's testicles and penis in a manner that made John Doe 175 feel very uncomfortable.

71.     John Doe 175 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 175.

72.     John Doe 175 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 175 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 175. And John Doe 175 was raised to believe that doctors help their patients, not hurt them.

73.     Before May 15, 2019, John Doe 175 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 175 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 175 on notice that Strauss was a sexual predator.

74.     Before May 15, 2019, John Doe 175 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

75.     After May 15, 2019, John Doe 175 learned that Strauss' examinations in which Strauss manipulated John Doe 175's genitals were medically unwarranted, improper, and even criminal. John Doe 175 also learned that Strauss was a serial sexual offender. Then John Doe 175 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

76.     OSU showed more than deliberate indifference by placing John Doe 175 under Strauss' care. OSU betrayed John Doe 175 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 175 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

77.     Plaintiff John Doe 176 is a resident of the State of Florida.

78.     Plaintiff John Doe 176 attended OSU from 1980-1986 and was a member of the football team for 4 years while he attended OSU.

79.     Strauss treated John Doe 176 approximately 3 times while John Doe 176 was a student athlete on the football team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 176 2 times. Strauss sexually assaulted/abused John Doe 176 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 176's genitals in a manner that made John Doe 176 feel very uncomfortable.

80.     John Doe 176 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 176.

81.     John Doe 176 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 176 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 176. And John Doe 176 was raised to believe that doctors help their patients, not hurt them.

82.     Before May 15, 2019, John Doe 176 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 176 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 176 on notice that Strauss was a sexual predator.

83. Before May 15, 2019, John Doe 176 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

84. After May 15, 2019, John Doe 176 learned that Strauss' examinations in which Strauss manipulated John Doe 176's genitals were medically unwarranted, improper, and even criminal. John Doe 176 also learned that Strauss was a serial sexual offender. Then John Doe 176 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

85. OSU showed more than deliberate indifference by placing John Doe 176 under Strauss' care. OSU betrayed John Doe 176 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 176 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

86. Plaintiff John Doe 177 is a resident of the State of Florida.

87. Plaintiff John Doe 177 attended OSU from 1984-1987 and was a member of the football team for 3 years while he attended OSU.

88. Strauss treated John Doe 177 approximately 12 times while John Doe 177 was a student athlete on the football team at OSU. Of those 12 times, Strauss sexually assaulted/abused John Doe 177 at least 9 times. Strauss sexually assaulted/abused John Doe 177 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 177's penis and testicles in a manner that made John Doe 177 feel very uncomfortable.

89. John Doe 177 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 177.

90. John Doe 177 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 177 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 177. And John Doe 177 was raised to believe that doctors help their patients, not hurt them.

91. Before May 15, 2019, John Doe 177 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 177 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 177 on notice that Strauss was a sexual predator.

92. Before May 15, 2019, John Doe 177 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

93. After May 15, 2019, John Doe 177 learned that Strauss' examinations in which Strauss manipulated John Doe 177's genitals were medically unwarranted, improper, and even criminal. John Doe 177 also learned that Strauss was a serial sexual offender. Then John Doe 177 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

94. OSU showed more than deliberate indifference by placing John Doe 177 under Strauss' care. OSU betrayed John Doe 177 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 177 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

95.     Plaintiff John Doe 178 is a resident of the State of West Virginia.

96.     Plaintiff John Doe 178 attended OSU from 1994-1998 and was a member of the football team for 4 years while he attended OSU.

97.     Strauss treated John Doe 178 approximately 6 times while John Doe 178 was a student athlete on the football team at OSU, prior to 1998. Of those 6 times, Strauss sexually assaulted/abused John Doe 178 every time. Strauss sexually assaulted/abused John Doe 178 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 178's genitals in a manner that made John Doe 178 feel very uncomfortable. Also, Strauss sexually assaulted/abused John Doe 178 by performing a rectal exam where he digitally penetrated John Doe 178 under the guise of a prostate exam.

98.     John Doe 178 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 178. John Doe 178 also remembers Strauss making him strip completely naked during the exams and placing his face near his genitals.

99.     John Doe 178 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 178 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 178. And John Doe 178 was raised to believe that doctors help their patients, not hurt them.

100.    Before May 15, 2019, John Doe 178 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 178 on notice that Strauss might have been

sexually assaulting him. Likewise, OSU did nothing to put John Doe 178 on notice that Strauss was a sexual predator.

101. Before May 15, 2019, John Doe 178 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

102. After May 15, 2019, John Doe 178 learned that Strauss' examinations in which Strauss manipulated John Doe 178's genitals and digitally penetrated him were medically unwarranted, improper, and even criminal. John Doe 178 also learned that Strauss was a serial sexual offender. Then John Doe 178 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

103. OSU showed more than deliberate indifference by placing John Doe 178 under Strauss' care. OSU betrayed John Doe 178 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 178 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

104. Plaintiff John Doe 179 is a resident of the State of Ohio.

105. Plaintiff John Doe 179 attended OSU from 1982-1986 and was a member of the football team for 4 years while he attended OSU.

106. Strauss treated John Doe 179 approximately 6 times while John Doe 179 was a student athlete on the football team at OSU. Of those 6 times, Strauss sexually assaulted/abused John Doe 179 4 times. Strauss sexually assaulted/abused John Doe 179 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 179's testicles and penis to the point of erection and ejaculation. This was all done in a manner

20

that made John Doe 179 feel very uncomfortable. Also, Strauss sexually assaulted/abused John Doe 179 by performing a rectal exam where he digitally penetrated John Doe 179 under the guise of a prostate exam.

107.    John Doe 179 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 179.

108.    John Doe 179 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 179 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 179. And John Doe 179 was raised to believe that doctors help their patients, not hurt them.

109.    Before May 15, 2019, John Doe 179 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 179 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 179 on notice that Strauss was a sexual predator.

110.    Before May 15, 2019, John Doe 179 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

111.    After May 15, 2019, John Doe 179 learned that Strauss' examinations in which Strauss manipulated John Doe 179's genitals and digitally penetrated him were medically unwarranted, improper, and even criminal. John Doe 179 also learned that Strauss was a serial sexual offender. Then John Doe 179 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

112.    OSU showed more than deliberate indifference by placing John Doe 179 under Strauss' care. OSU betrayed John Doe 179 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 179 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

113.    Plaintiff John Doe 180 is a resident of China.

114.    Plaintiff John Doe 180 attended OSU from 1985-1991 and was a member of the wrestling team for 3 years while he attended OSU.

115.    Strauss treated John Doe 180 approximately 10 times while John Doe 180 was a student athlete on the wrestling team at OSU. Of those 10 times, Strauss sexually assaulted/abused John Doe 180 8 times. Strauss sexually assaulted/abused John Doe 180 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 180's genitals in a manner that made John Doe 180 feel very uncomfortable. Also, Strauss sexually assaulted/abused John Doe 180 by performing a rectal exam where he digitally penetrated John Doe 180 under the guise of a prostate exam.

116.    John Doe 180 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 180. John Doe 180 also remembers Strauss watching him and his teammates shower every day. Sometimes inside the shower room and sometimes outside of it.

117.    John Doe 180 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 180 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 180. And John Doe 180 was raised to believe that doctors help their patients, not hurt them.

118.    Before May 15, 2019, John Doe 180 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 180 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 180 on notice that Strauss was a sexual predator.

119.    Before May 15, 2019, John Doe 180 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

120.    After May 15, 2019, John Doe 180 learned that Strauss' examinations in which Strauss manipulated John Doe 180's genitals and digitally penetrated him were medically unwarranted, improper, and even criminal. John Doe 180 also learned that Strauss was a serial sexual offender. Then John Doe 180 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

121.    OSU showed more than deliberate indifference by placing John Doe 180 under Strauss' care. OSU betrayed John Doe 180 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 180 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

122.    Plaintiff John Doe 181 is a resident of the State of Ohio.

123.    Plaintiff John Doe 181 attended OSU from 1985-1988 and was a member of the ice hockey team for 3 years while he attended OSU.

124.    Strauss treated John Doe 181 approximately 6 times while John Doe 181 was a student athlete on the ice hockey team at OSU. Of those 6 times, Strauss sexually assaulted/abused John Doe 181 at least 2 times. Strauss sexually assaulted/abused John Doe 181 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 181's genitals in a manner that made John Doe 181 feel very uncomfortable.

125.    John Doe 181 recalls Strauss taking a lot of pictures of him.

126.    John Doe 181 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 181 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 181. And John Doe 181 was raised to believe that doctors help their patients, not hurt them.

127.    Before May 15, 2019, John Doe 181 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 181 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 181 on notice that Strauss was a sexual predator.

128.    Before May 15, 2019, John Doe 181 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

129.    After May 15, 2019, John Doe 181 learned that Strauss' examinations in which Strauss manipulated John Doe 181's genitals were medically unwarranted, improper, and even criminal. John Doe 181 also learned that Strauss was a serial sexual offender. Then John Doe 181 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

24

130.    OSU showed more than deliberate indifference by placing John Doe 181 under Strauss' care. OSU betrayed John Doe 181 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 181 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

131.    Plaintiff John Doe 182 is a resident of the State of Ohio.

132.    Plaintiff John Doe 182 attended OSU from 1981-1985 and returned to graduate in 2020. John Doe 182 and was a member of the football team for 4 years while he attended OSU in the 1980s.

133.    Strauss treated John Doe 182 approximately 9 times while John Doe 182 was a student athlete on the football team. Of those 9 times, Strauss sexually assaulted/abused John Doe 182 every time. Strauss sexually assaulted/abused John Doe 182 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 182's genitals in a manner that made John Doe 182 feel very uncomfortable.

134.    John Doe 182 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 182. John Doe 182 also remembers Strauss making him strip completely naked for his exams.

135.    John Doe 182 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 182 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 182. And John Doe 182 was raised to believe that doctors help their patients, not hurt them.

136.     Before May 15, 2019, John Doe 182 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 182 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 182 on notice that Strauss was a sexual predator.

137.     Before May 15, 2019, John Doe 182 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

138.     After May 15, 2019, John Doe 182 learned that Strauss' examinations in which Strauss manipulated John Doe 182's genitals were medically unwarranted, improper, and even criminal. John Doe 182 also learned that Strauss was a serial sexual offender. Then John Doe 182 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

139.     OSU showed more than deliberate indifference by placing John Doe 182 under Strauss' care. OSU betrayed John Doe 182 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 182 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

140.     Plaintiff John Doe 183 is a resident of the State of Ohio.

141.     Plaintiff John Doe 183 attended OSU from 1980-1983 and was a member of the football team for 4 years while he attended OSU.

142.     Strauss treated John Doe 183 approximately 8 times while John Doe 183 was a student athlete on the football team at OSU. Of those 8 times, Strauss sexually assaulted/abused John Doe 183 every time. Strauss sexually assaulted/abused John Doe 183 by conducting long

26

genital exams where Strauss would excessively fondle and move his hands around John Doe 183's genitals in a manner that made John Doe 183 feel very uncomfortable.

143.    John Doe 183 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 183.

144.    John Doe 183 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 183 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 183. And John Doe 183 was raised to believe that doctors help their patients, not hurt them.

145.    Before May 15, 2019, John Doe 183 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 183 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 183 on notice that Strauss was a sexual predator.

146.    Before May 15, 2019, John Doe 183 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

147.    After May 15, 2019, John Doe 183 learned that Strauss' examinations in which Strauss manipulated John Doe 183's genitals were medically unwarranted, improper, and even criminal. John Doe 183 also learned that Strauss was a serial sexual offender. Then John Doe 183 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

148. OSU showed more than deliberate indifference by placing John Doe 183 under Strauss' care. OSU betrayed John Doe 183 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 183 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

149. Plaintiff John Doe 184 is a resident of the State of Florida.

150. Plaintiff John Doe 184 attended OSU from 1982-1986 and was a member of the football team for 5 years while he attended OSU.

151. Strauss treated John Doe 184 approximately 5 times while John Doe 184 was a student athlete on the football team at OSU. Of those 5 times, Strauss sexually assaulted/abused John Doe 184 every time. Strauss sexually assaulted/abused John Doe 184 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 184's genitals in a manner that made John Doe 184 feel very uncomfortable.

152. John Doe 184 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 184. John Doe 184 also remembers Strauss brushing his body into him while he stood between his legs asking John Doe 184 questions.

153. John Doe 184 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 184 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 184. And John Doe 184 was raised to believe that doctors help their patients, not hurt them.

154. Before May 15, 2019, John Doe 184 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 184 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 184 on notice that Strauss was a sexual predator.

155. Before May 15, 2019, John Doe 184 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

156. After May 15, 2019, John Doe 184 learned that Strauss' examinations in which Strauss manipulated John Doe 184's genitals were medically unwarranted, improper, and even criminal. John Doe 184 also learned that Strauss was a serial sexual offender. Then John Doe 184 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

157. OSU showed more than deliberate indifference by placing John Doe 184 under Strauss' care. OSU betrayed John Doe 184 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 184 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

158. Plaintiff John Doe 185 is a resident of the State of New Jersey.

159. Plaintiff John Doe 185 attended OSU from 1988-1992 and was a member of the wrestling team for 5 years while he attended OSU.

160. Strauss treated John Doe 185 approximately 50 times while John Doe 185 was a student athlete on the wrestling team at OSU. Of those 50 times, Strauss sexually assaulted/abused John Doe 185 30 times. Strauss sexually assaulted/abused John Doe 185 by

conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 185's genitals in a manner that made John Doe 185 feel very uncomfortable.

161.     John Doe 185 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 185. John Doe 185 also had one exam where Strauss wanted to check for hemorrhoids and had John Doe 185 lay on his side. Strauss then touched his anus for an extended period of time. Strauss also showered with the team almost daily and would rub lotion on his body in the locker room while looking at the wrestlers. Strauss spent an excessive time massaging his own genitals to the point of getting a partial erection while looking at John Doe 185.

162.     John Doe 185 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 185 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 185. And John Doe 185 was raised to believe that doctors help their patients, not hurt them.

163.     Before May 15, 2019, John Doe 185 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 185 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 185 on notice that Strauss was a sexual predator.

164.     Before May 15, 2019, John Doe 185 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

165.     After May 15, 2019, John Doe 185 learned that Strauss' examinations in which Strauss manipulated John Doe 185's genitals and touched his anus were medically unwarranted,

improper, and even criminal. John Doe 185 also learned that Strauss was a serial sexual offender. Then John Doe 185 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

166.    OSU showed more than deliberate indifference by placing John Doe 185 under Strauss' care. OSU betrayed John Doe 185 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 185 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

167.    Plaintiff John Doe 186 is a resident of the State of Texas.

168.    Plaintiff John Doe 186 attended OSU from 1990-1994 and was a member of the gymnastics team for 1 1/2 years and the cheerleading squad for 1 year while he attended OSU.

169.    Strauss treated John Doe 186 approximately 1 time while John Doe 186 was a student athlete on the gymnastics team and the cheerleading squad at OSU. Strauss sexually assaulted/abused John Doe 186 1 time. Strauss sexually assaulted/abused John Doe 186 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 186's penis to the point of erection. This was all done in a manner that made John Doe 186 feel very uncomfortable.

170.    The exams involved Strauss trying to arouse John Doe 186. John Doe 186 also remembers Strauss making him take all of his clothes off.

171.    John Doe 186 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 186 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 186. And John Doe 186 was raised to believe that doctors help their patients, not hurt them.

172.　Before May 15, 2019, John Doe 186 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 186 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 186 on notice that Strauss was a sexual predator.

173.　Before May 15, 2019, John Doe 186 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

174.　After May 15, 2019, John Doe 186 learned that Strauss' examination in which Strauss manipulated John Doe 186's genitals was medically unwarranted, improper, and even criminal. John Doe 186 also learned that Strauss was a serial sexual offender. Then John Doe 186 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

175.　OSU showed more than deliberate indifference by placing John Doe 186 under Strauss' care. OSU betrayed John Doe 186 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 186 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

176.　Plaintiff John Doe 187 is a resident of Alberta, Canada.

177.　Plaintiff John Doe 187 attended OSU from 1991-1995 and was a member of the football team for 5 years while he attended OSU.

178. Strauss treated John Doe 187 approximately 15 times while John Doe 187 was a student athlete on the football team at OSU. Of those 15 times, Strauss sexually assaulted/abused John Doe 187 every time. Strauss sexually assaulted/abused John Doe 187 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 187's penis in a manner that made John Doe 187 feel very uncomfortable.

179. John Doe 187 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 187.

180. John Doe 187 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 187 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 187. And John Doe 187 was raised to believe that doctors help their patients, not hurt them.

181. Before May 15, 2019, John Doe 187 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 187 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 187 on notice that Strauss was a sexual predator.

182. Before May 15, 2019, John Doe 187 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

183. After May 15, 2019, John Doe 187 learned that Strauss' examinations in which Strauss manipulated John Doe 187's genitals were medically unwarranted, improper, and even criminal. John Doe 187 also learned that Strauss was a serial sexual offender. Then John Doe

187 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

184.    OSU showed more than deliberate indifference by placing John Doe 187 under Strauss' care. OSU betrayed John Doe 187 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 187 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

185.    Plaintiff John Doe 188 is a resident of the State of Ohio.

186.    Plaintiff John Doe 188 attended OSU from 1994-1998 and was a member of the football team for 5 years while he attended OSU.

187.    Strauss treated John Doe 188 approximately 2 times while John Doe 188 was a student athlete on the football team at OSU in 1994. Of those 2 times, Strauss sexually assaulted/abused John Doe 188 both times. Strauss sexually assaulted/abused John Doe 188 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 188's genitals in a manner that made John Doe 188 feel very uncomfortable. During one of the exams, Strauss said he had to check him again and fondled his genitals twice in one exam.

188.    John Doe 188 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 188.

189.    John Doe 188 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 188 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 188. And John Doe 188 was raised to believe that doctors help their patients, not hurt them.

190.    Before May 15, 2019, John Doe 188 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 188 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 188 on notice that Strauss was a sexual predator.

191.    Before May 15, 2019, John Doe 188 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

192.    After May 15, 2019, John Doe 188 learned that Strauss' examinations in which Strauss manipulated John Doe 188's genitals were medically unwarranted, improper, and even criminal. John Doe 188 also learned that Strauss was a serial sexual offender. Then John Doe 188 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

193.    OSU showed more than deliberate indifference by placing John Doe 188 under Strauss' care. OSU betrayed John Doe 188 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 188 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

194.    Plaintiff John Doe 189 is a resident of the State of Texas.

195.    Plaintiff John Doe 189 attended OSU from 1985-1991 and was a member of the basketball team for 5 years while he attended OSU.

196.     Strauss treated John Doe 189 approximately 3 times while John Doe 189 was a student athlete on the basketball team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 189 every time. Strauss sexually assaulted/abused John Doe 189 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 189's genitals in a manner that made John Doe 189 feel very uncomfortable.

197.     John Doe 189 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 189.

198.     John Doe 189 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 189 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 189. And John Doe 189 was raised to believe that doctors help their patients, not hurt them.

199.     Before May 15, 2019, John Doe 189 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 189 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 189 on notice that Strauss was a sexual predator.

200.     Before May 15, 2019, John Doe 189 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

201.     After May 15, 2019, John Doe 189 learned that Strauss' examinations in which Strauss manipulated John Doe 189's genitals were medically unwarranted, improper, and even criminal. John Doe 189 also learned that Strauss was a serial sexual offender. Then John Doe

189 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

202.     OSU showed more than deliberate indifference by placing John Doe 189 under Strauss' care. OSU betrayed John Doe 189 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 189 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

203.     Plaintiff John Doe 190 is a resident of the State of Texas.

204.     Plaintiff John Doe 190 attended OSU from 1993-1998 and was a member of the football team for 5 years while he attended OSU.

205.     Strauss treated John Doe 190 approximately 12 times while John Doe 190 was a student athlete on the football team at OSU, prior to 1997. Of those 12 times, Strauss sexually assaulted/abused John Doe 190 every time. Strauss sexually assaulted/abused John Doe 190 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 190's penis and genitals in a manner that made John Doe 190 feel very uncomfortable.

206.     John Doe 190 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 190. John Doe 190 also remembers Strauss asking him to bend over the exam table. Strauss then stood behind him and reached around to grab his genitals.

207.     John Doe 190 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 190 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 190. And John Doe 190 was raised to believe that doctors help their patients, not hurt them.

208.    Before May 15, 2019, John Doe 190 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 190 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 190 on notice that Strauss was a sexual predator.

209.    Before May 15, 2019, John Doe 190 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

210.    After May 15, 2019, John Doe 190 learned that Strauss' examinations in which Strauss manipulated John Doe 190's genitals were medically unwarranted, improper, and even criminal. John Doe 190 also learned that Strauss was a serial sexual offender. Then John Doe 190 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

211.    OSU showed more than deliberate indifference by placing John Doe 190 under Strauss' care. OSU betrayed John Doe 190 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 190 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

212.    Plaintiff John Doe 191 is a resident of the State of Ohio.

213.    Plaintiff John Doe 191 attended OSU from 1991-1994 and was a member of intramural sports for 2 years while he attended OSU.

214.    Strauss treated John Doe 191 approximately 2 times while John Doe 191 was a student at OSU. Of those 2 times, Strauss sexually assaulted/abused John Doe 191 1 time. Strauss sexually assaulted/abused John Doe 191 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 191's genitals in a manner that made John Doe 191 feel very uncomfortable.

215.    John Doe 191 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 191 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 191. And John Doe 191 was raised to believe that doctors help their patients, not hurt them.

216.    Before May 15, 2019, John Doe 191 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 191 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 191 on notice that Strauss was a sexual predator.

217.    Before May 15, 2019, John Doe 191 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

218.    After May 15, 2019, John Doe 191 learned that Strauss' examination in which Strauss manipulated John Doe 191's genitals were medically unwarranted, improper, and even criminal. John Doe 191 also learned that Strauss was a serial sexual offender. Then John Doe 191 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

219.    OSU showed more than deliberate indifference by placing John Doe 191 under Strauss' care. OSU betrayed John Doe 191 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 191 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

220.    Plaintiff Jane Doe 1 is a resident of the State of Ohio.

221.    Plaintiff Jane Doe 1 attended OSU from 1994-1998.

222.    Strauss treated Jane Doe 1 approximately 1 time while Jane Doe 1 was a student at OSU. Strauss sexually assaulted/abused Jane Doe 1 1 time. Strauss sexually assaulted/abused Jane Doe 1 by conducting long a long breast exam where Strauss excessively fondled and groped Jane Doe 1's breasts in a manner that made Jane Doe 1 feel very uncomfortable.

223.    The exam involved Strauss trying to arouse Jane Doe 1.

224.    Jane Doe 1 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. Jane Doe 1 expected that OSU demanded the same excellence from Strauss that they demanded from Jane Doe 1. And Jane Doe 1 was raised to believe that doctors help their patients, not hurt them.

225.    Before May 15, 2019, Jane Doe 1 did not know Strauss had sexually assaulted her. In short, nothing Strauss did placed Jane Doe 1 on notice that Strauss might have been sexually assaulting her. Likewise, OSU did nothing to put Jane Doe 1 on notice that Strauss was a sexual predator.

226. Before May 15, 2019, Jane Doe 1 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

227. After May 15, 2019, Jane Doe 1 learned that Strauss' examination in which Strauss fondled and groped Jane Doe 1's breasts was medically unwarranted, improper, and even criminal. Jane Doe 1 also learned that Strauss was a serial sexual offender. Then Jane Doe 1 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

228. OSU showed more than deliberate indifference by placing Jane Doe 1 under Strauss' care. OSU betrayed Jane Doe 1 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed Jane Doe 1 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

<u>STRAUSS</u>

229. OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

230. In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

231. By 1980, Strauss was Associate Director of the Sports Medicine Program. In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services. By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

232. OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992. Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 31,32.)

233. Throughout his employment, Strauss provided medical services to various OSU sports teams. Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall. At that time, Larkins Hall was OSU's physical education building and aquatics facility.

234. "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic. As time went on, Strauss treated students "who participated in a wide range of sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 34).

235. Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

<u>STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE</u>

236. Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

   a. In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

42

    b.   In the context of a medical examination that caused the student to reach erection or nearly reach erection;

    c.   Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

    d.   Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

    e.   Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 39)

237.    Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

238.    Strauss committed these acts of sexual abuse while an OSU faculty member.

## WHY PLAINTIFFS' HAD DIFFICULTY REALIZING OR REPORTING STRAUSS' CONDUCT AS SEXUALLY ABUSIVE

239.    Plaintiffs were vulnerable to Strauss' sexual abuse and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

240.    Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

241.    Plaintiffs had to pass a pre-season physical in order to participate in their sport.

242.    Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

243.    Plaintiffs tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

244.    Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury.  They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

245.    When Strauss abused Plaintiffs, sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

246.    Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

247.    Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

248.    Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

249.    There was a huge disparity between Strauss' medical knowledge and the Plaintiffs.  They had no standing to challenge his explanations for the things he did to them.

250.    Plaintiffs were on Strauss' "turf" when he examined them in his office with the door closed.  Strauss' psychological and educational advantage over each athlete in the

examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

251.    Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them.  They knew that doctors often have to touch their patients as part of their work.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

252.    Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

253.    Plaintiffs entered Strauss' examination rooms presuming that what occurred in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk one's athletic scholarship.

254.    Plaintiffs maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  They despised Strauss' medical exams but were willing to endure them if that was a requirement to keep their scholarships.

255.    Plaintiffs maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

256.     Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

257.     OSU teams always compete at the highest possible level. Plaintiffs were therefore expected to perform at their best. That required Plaintiffs to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to judge whether a reputed world-class sports physician's overly thorough examinations were improper just because things felt wrong or overly invasive. Plaintiffs thought Strauss to be an elite sports doctor, just like they were elite athletes. Plaintiffs also thought that OSU was a reputable and renowned institution that would protect the interests and well-being of their student athletes and act on any reports of inappropriate behavior by their faculty. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a difficult step forward in their quest for excellence and thought that OSU would have stopped the behavior if it was not furthering that quest.

258.     Plaintiffs, as athletes, were expected to be tough and not to complain.

259.     OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled their scholarships. Plaintiffs had no say in who treated them.

260.     To the extent any Plaintiffs may have complained about this conduct by Strauss, OSU failed to act upon or otherwise dismissed these concerns.

261.     None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias,

swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostate, or anus.

262.     None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

263.     None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

264.     When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred.  While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the past two years that Strauss touched them in an unlawful manner.

265.     Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination methods and statements, though unpleasant and embarrassing, were medically acceptable practices.

266.     Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a criminal act?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes in light of their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room laughed that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

267.    Not until within the past two years have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing students in a clinical setting.

268.    Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Strauss was sexually abusing them and other OSU students, particularly student-athletes.

269.    Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

## OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

270.    "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

271.    On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had, at minimum, actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing student-athletes and other OSU students.

272.    As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to athletes on OSU's intercollegiate sports teams.  Among other things, "[p]ersonnel in the University's Sports

medicine program and Athletics Department were aware that Strauss was conducting genital examinations on athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

273.    Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct.  At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other OSU athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

274.    As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the . . . . students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

275.    Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on the schedule, took unusually long times examining them, conducted examinations behind closed doors, and failed to fill out medical records documenting the medical services he provided.

276.    Strauss was never disciplined for failing to create or complete medical records, even though such records are standard medical practice and important to providing continuity of care.

277.    By failing to insist that Strauss properly document all patient encounters, OSU made it easy for Strauss to lie about every aspect of what took place during patient visits, or even to deny that he had treated a particular student.

278.    OSU never told Strauss to stop showering with the athletes.

279.    OSU never ordered Strauss to have a third person in the room whenever he was treating a patient.

280.    OSU did not diligently follow up on any of the rumors or reports regarding Strauss until 1994.

281.    At all relevant times, OSU also did not have a meaningful complaint or dispute resolution process for allegations of faculty sexual harassment or abuse.  On information and belief, OSU's faculty dispute procedure instructed complainants to attempt an informal resolution, i.e., a mediation, with the faculty member at issue before going through other channels. It made no sense to recommend that victims of sexual abuse and harassment try to negotiate a resolution with their abusers before seeking formal redress.

282.    At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every imaginable way. It effectively gave Strauss a green light to prey upon OSU students as he saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and harass Plaintiffs and other OSU students.

## CONDITIONS AT LARKINS HALL

283.    During the Strauss years, Larkins Hall was in of itself a constant source of sexual harassment for the members of the athletics teams based inside it. Larkins Hall was home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While Strauss participated in the sexual harassment that took place in Larkins Hall, he did not independently create the sexually hostile environment that affected the Plaintiffs.

284.    All university faculty and students were allowed to use the same showers as the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes showered at the same time as wrestlers and soaped their groins vigorously while watching the wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team changed its practice time, many of the voyeurs shifted their shower times to coincide with the wrestling team's new schedule.

285.    Wrestlers were frequently approached in the bathroom and showers and propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to meet up for sex.

286.    The harassment was so constant that one wrestler called getting to and from the showers "running the gauntlet."

287.    The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

288.     One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the athletes who shared lockers or facilities with non-team members.

289.     Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

290.     Hellickson requested a separate team shower area. OSU denied his request.

291.     Hellickson begged to have the wrestling team moved to another building. OSU denied his request.

292.     When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as long as they wanted.  They denied staring at the wrestlers. University police would not make them leave.

293.     Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other athletes whose teams were based there.

**CLAIM FOR RELIEF**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a), *et seq.***
**Heightened Risk Claim**

294.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

295.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

296.    Title IX is implemented through the Code of Federal Regulations. See 33 C.F.R. Part 106. 33 C.F.R. § 106.8(b), which provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

297.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

298.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

299.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

300.    At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

301.    Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

302.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

303.    Strauss' sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

304.    OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

305.    OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

306.    Specifically, OSU knew about Strauss' sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

307.    Throughout Strauss' 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss' inappropriate sexual conduct.

308.    Given the magnitude of Strauss' abuse—involving students and student- athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss' sexual abuse.

309.    Nonetheless, OSU did nothing to address the complaints and concerns about Strauss.

310.    OSU's failure to respond promptly and adequately to allegations of Strauss' abuse constitutes sex discrimination, in violation of Title IX.

311.    By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other OSU students were experiencing. OSU's deliberate indifference included, without limitation:

    a.   Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

    b.   Failing to promptly and adequately investigate allegations of Strauss' sexual assault, abuse, and molestation;

    c.   Requiring athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss' abuse;

    d.   Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

    e.   Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss' abuse of student-athletes;

    f.   Failing to adequately supervise Strauss, after learning that he posed a substantial risk to the safety of students and student-athletes;

    g.   Failing to require that Strauss properly document all patient encounters;

    h.   Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting other students; and

    i.   Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

312.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct caused Plaintiffs (and other OSU students) to experience further sexual harassment and/or made them vulnerable to it.

313.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct created a sexually hostile environment that

effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

314.    As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

### COUNT II: Violation of Title IX
### 20 U.S.C. § 1681(a), *et seq.* Hostile Environment

315.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

316.    Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (collectively "Larkins Plaintiffs") were entitled to use the athletics facilities free from sexual harassment.  However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said Larkins Plaintiffs from access to numerous educational opportunities and benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

317.    The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

318.    Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

319.    OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

320.    Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other student-athletes who used the Larkins Hall facilities between 1978-1998.

321.    OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

322.    As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b)    Enter judgment in favor of the Larkins Plaintiffs on their claim for discrimination under Count II Title IX against Defendant The Ohio State University;

(c)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)     Award Plaintiffs pre-judgment and post-judgment interest;

(g)     Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 41 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com

*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**WRIGHT & SCHULTE, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com
*Counsel for Plaintiffs*