**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOES 172-191, AND JANE DOE 1 | |
| Plaintiffs, | Case No. 2:21-cv-02121-MHW-EPD |
| v. | Judge Michael H. Watson |
| THE OHIO STATE UNIVERSITY, | Chief Magistrate Judge Elizabeth P. Deavers |
| Defendant. | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT (Doc. 9)**

**MEMORANDUM OF LAW**

**INTRODUCTION AND STATEMENT OF THE CASE**

Plaintiffs John Does 172 – 191 and Jane Doe 1 ("Plaintiffs") are among Dr. Strauss' many sexual assault victims. They asked to participate in the settlement program and resolve their claim, but Defendant The Ohio State University ("Defendant," "Ohio State," or "OSU") refused to include them in the program. By its actions and deliberate indifference, Ohio State allowed and enabled Dr. Strauss to sexually assault hundreds of young students under the guise of legitimate medical examinations. A law firm hired by Ohio State determined after an extensive investigation that Dr. Strauss' examinations were in fact sexual assaults, and that Ohio State knew they were sexual assaults and not legitimate medical examinations. Until Plaintiffs learned about the law firm's findings in a 2019 published report, these sexual abuse survivors reasonably believed that Dr. Strauss' examinations were legitimate and that Ohio State would never have allowed a licensed physician to assault and rape them.

Ohio State allowed the horiffic rape and abuse of these young students' bodies, lives and psyches to continue for decades. During this period, Ohio State's Dr. Strauss digitally raped John Doe 174's anus under the guise of a legitimate prostate exam, and also excessively fondled his crotch while massaging his groin. Ohio State's Dr. Strauss sexually assaulted John Doe 179 when Strauss excessively fondled his testicles and penis to the point of erection and ejaculation, and also digitally raped John Doe 179 under the guise of a legitimate prostate exam. These are but two examples; every assault traumatized a young life. Ohio State has filed a Motion to Dismiss ("Motion") Plaintiffs' Amended Complaint ("Am. Compl."), and this pleading is Plaintiffs' Memorandum in Opposition to the Motion. The Court should deny Defendant's meritless Motion.

## FACTUAL BACKGROUND

### Plaintiffs, Like Strauss' other Victims, Could Not, and Did Not, Know that Dr. Strauss Assaulted Them

Ohio State employed Dr. Strauss to provide medical care and treatment to its students and student athletes and designated him as team physician for many sports. Am. Compl., at ¶ 8. Strauss used this position of trust to sexually abuse male students on a regular basis for over twenty years. Strauss' abuse included digitally raping patients; excessive touching all over students' bodies, causing students to reach, or nearly reach, ejaculation; unnecessary fondling and groping of the genitals or rectum; and positioning his patients so his face was at the same height as their crotches and so near that patients could feel Strauss' breath on their genitals. *Id*. at ¶¶ 11, 280. In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP issued its Report on May 15, 2019 (the "Report"). *Id*. at ¶ 14[1].

---

[1] A redacted copy of the full Report, which is identified and referenced in the Amended Complaint and in this pleading, can be found at Defendant's website: https://compliance.osu.edu/assets/site/pdf/Revised_report.pdf (last accessed September 12, 2021).

The Court must accept as true Plaintiffs' allegations that they did not and were unable to understand that they were sexually assaulted for several reasons, including that (1) Plaintiffs believed that doctors are trustworthy and do not intentionally hurt patients; (2) male sexual abuse was not a commonly known problem or topic; (3) Plaintiffs had no education, training, or experience that would allow them to differentiate between a legitimate medical examination and one that exceeded professional boundaries, and constituted rape; and (4) Plaintiffs' understandable confusion about whether sexual abuse could have even occurred given the allegedly abusive activity occurred within the context of a purported legitimate medical examination. *Id.* at ¶¶ 296 - 301. Lest the Court have any doubt here, Perkins Coie reached the same conclusions in its Report finding that "[t]his case presented an intersection of two specific types of sexual abuse, both of which have generally not been associated with common social conceptions of sexual abuse[:]…doctor-patient sexual abuse and the sexual abuse of adult males[,]" and concluding that "[p]atients *often* do not report sexual abuse committed by their doctors due to…*confusion as to whether sexual abuse, in fact, occurred."* Report, at 23 (emphasis added).

Before forming an opinion on whether Dr. Strauss had done anything wrong, Perkins Coie deemed it "***essential***" for them to "consult with suitably qualified medical experts" "to discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary…" Am. Compl., at ¶ 330; Report, at 24 (emphasis added). With this statement, the experienced and highly-educated legal counsel at Perkins Coie acknowledged they lacked the education, training, or experience to form a reasonably reliable opinion on whether Dr. Strauss violated any medical or ethical standards whatsoever during the course of examining or treating any of the hundreds of plaintiffs in these related cases. Plaintiffs were far less educated or experienced than Perkins Coie's investigative team when Dr.

Strauss examined them. Plaintiffs understood a doctor had to touch their bodies to do his work. Am. Compl. at ¶ 306. They knew Dr. Strauss held a respected position as a physician for an elite university, and they were completely naive about what Dr. Strauss was supposed to do, or not do, when evaluating their reported complaints, checking for physical abnormalities, or evaluating their overall health.

Ohio State hired independent investigators to determine, among other things, whether Dr. Strauss did anything wrong when treating the Plaintiffs. If Ohio State – through its investigators – needed to consult multiple medical experts before concluding whether Dr. Strauss violated any medical or ethical standards, it is outrageous for Ohio State to argue that young, inexperienced college students like Plaintiffs knew, or should have known, as a matter of law that Strauss was sexually assaulting them. Plaintiffs submit it would also be the height of hypocrisy for this judicial system to declare, as a matter of law, that Plaintiffs knew or should have known they were being subjected to inappropriate behavior during the course of their confidential physician-patient relationship, when this same judicial system deems the Plaintiffs incompetent *per se* to testify in any way about the medical propriety of what Dr. Strauss did during their clinical visits with them. If this Court were to hold that Plaintiffs' clinical encounters with Dr. Strauss put them on notice, as a matter of law, that they were likely being sexually assaulted, the result would be both bizarre and fundamentally unfair to Plaintiffs. Such a ruling would effectively shift all responsibility for investigating known red flags about Dr. Strauss' behavior and ending his misconduct away from the system that hired, supervised, and evaluated Dr. Strauss' performance, by putting it on persons whom the law declares *incompetent* even to form or offer opinions on such issues. Patients would be required to know *when* Dr. Strauss' violated their doctor-patient relationship despite being unable to determine *whether* Dr. Strauss had done anything wrong.

There is unfortunately a longstanding, lingering, cynical notion in our society that patients should somehow know or suspect when their doctor is surreptitiously abusing their confidential relationship and sexually assaulting them, or that male patients somehow "know better" and can be expected to immediately recognize professional impropriety and confront their doctor. As the Perkins Coie report makes clear, such a notion reflects a profound lack of understanding about sexual assault in the context of a doctor's physical examination, as well as our society's desire not to confront the doctors we have all been raised to trust and admire. Even more regrettably, this outdated, wrong thinking has crept its way into judicial opinions and survived into the twenty-first century; many courts have dismissed claims because judges deemed themselves qualified to state, as a matter of law, what doctors' sexual assault victims "should have" known, believed, or done in response to a confusing event, medically "explained" by their trusted doctor, which left them feeling uneasy, and often ashamed of themselves for wondering whether their lower, prurient nature caused their confusion, bewilderment, and sometimes even physical arousal. With its effort to dismiss John Does' cases, Ohio State bets heavily on decisions that reflect such wrong notions that have no place in today's society. . Plaintiffs urge this Court to reject Ohio State's argument, and to issue a ruling that reflects the reality of patient ignorance and confusion when sexual assault occurs in the context of a patient-physician relationship. Victim blaming needs to end now.

### Plaintiffs, Like Strauss' Other Victims, Could Not and Did Not Know of the University's Title IX Violations

There is no way Plaintiffs or Strauss' other victims could have known that Ohio State knew about and failed to rid its campus of a sexual predator that Ohio State presented as a trusted, respected, and accomplished medical professional. In other words, Plaintiffs could not have

known that Ohio State acted with knowledge and deliberate indifference or that same was a cause of his injury.  Am. Compl. at ¶¶ 33, 34.  To the contrary, Plaintiffs believed that one of OSU's primary concerns would be making sure that it provided them safe, ethical medical services and that they could trust any doctor that a venerable institution like Ohio State would provide for them while they were OSU student athletes.  *Id*. at ¶ 19, 26.

Ohio State has introduced no evidence that Plaintiffs could have discovered or read anything that would have given them reason to believe that OSU knew about and turned a blind eye to Strauss' predatory compulsions.  Ohio State, in fact, commissioned the Report because OSU administrators kept this dark episode buried, even after moving on or retiring from OSU.  OSU needed to investigate the extent to which OSU knew about Strauss' conduct.  *Id*. at ¶ 14.  Yet Ohio State expects that Plaintiffs must have known what it hired Perkins Coie to determine:  that Ohio State was complicit in Strauss' abuse.

Ohio State, through fraud and deceit, kept secret its complicity in Strauss' predation for forty years.  Ohio State employed Dr. Strauss for twenty years, giving him progressively greater responsibility while funneling thousands of students to his examination room for sexual abuse and exploitation.  *Id*. at ¶¶ 3, 8, 274, 276.  Ohio State concealed, intentionally ignored or disregarded reports and other widely known information that indicated Strauss was a threat to his patients.  *Id*. at ¶ 9.  Perkins Coie's Report notes that student and university staff complained to various Ohio State staff as early as Strauss' first year with the University.  *Id*. at ¶ 332.

## STANDARD OF REVIEW

Courts reviewing a 12(b)(6) motion must accept the well-pled factual allegations of the complaint as true and construe all reasonable inferences in favor of the plaintiff.  *See Miller v. Currie,* 50 F.3d 373, 377 (6th Cir. 1995).  In turn, because the statute of limitations is an affirmative

6

defense, the burden is on the defendant to show the statute of limitations has run." *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 464 (6th Cir. 2013). Rule 12(b)(6) is ordinarily an "inappropriate vehicle for dismissing a claim based upon the statute of limitations" because a "plaintiff generally need not plead the lack of affirmative defenses to state a claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Dismissal is only warranted if "the allegations in the complaint affirmatively show that the claim is time barred." *Id.*

**LAW AND ARGUMENT**

    **I.**    **Plaintiffs Claims are Timely**

        **A. The federal discovery rule applies to Plaintiffs' Title IX claims, and Plaintiffs did not discovery their claims until the Report was released.**

Defendant wrongly claims Plaintiffs' suits are time barred. "To say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law." *City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 387-88 (10th Cir. 1979). A "statute of limitations begins to run" only once a "reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury." *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010). A plaintiff "cannot maintain an action before she knows she has one." *City of Aurora,* 599 F.2d at 387-88. What a plaintiff knew or should have known "is a question for the trier of fact." *In re Arctic Express Inc.*, 636 F.3d 781, 803 (6th Cir. 2011).

Plaintiffs agree their causes of action are subject to a two-year statute of limitations, but Defendant's claim that the discovery rule is inapplicable to Title IX claims is flat wrong. The Sixth Circuit Court of Appeals has historically applied the "discovery rule", and Defendant cites no case specifically rejecting it. In his concurring opinion in *Rotkiske v. Klemm*, 140 S.Ct. 355, 360 (2019), Justice Scalia called the discovery rule a "bad wine of recent vintage," but this passage

is not found in a majority opinion, it represented the belief of one Justice, and the Supreme Court did not decree that lower courts must abandon the discovery rule.  In *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021), the Court posited whether Justice Scalia's musing required the Sixth Circuit to reconsider its longstanding use of the discovery rule but did not answer the question because (according to the Court) that plaintiff's claim was time barred regardless of whether the Court applied the discovery rule[2].   Unless the Sixth Circuit should state otherwise, the discovery rule is properly applied in this Court, and thus, to Plaintiffs' Title IX abuse claims[3].

The federal discovery rule "incorporates the standard rule that the limitations period commences when the Plaintiff has a complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pens. Tr. Fund v. Ferbar Corp.*, 522 U.S. 192, 201 (1997).  The Sixth Circuit has consistently held that a claim accrues on the date when the plaintiff knew, or through reasonable diligence should have known, of an injury giving rise to the cause of action.  *See e.g. Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001).  In other words, "a cause of action accrue[s] under the discovery rule when [a plaintiff' first knew, or in the exercise of reasonable diligence should have known, of **both the injury and its cause."** *Fonseca v. Consol. Rai Corp.*, 246 F.3d 585, 590 (6th

---

[2] Even if the Court were somehow inclined to consider *Rotkiske* further, that case concerned a different statute and a different standard.  Specifically, *Rotkiske* considered the Fair Debt Collections Practices Act which mandates a civil action be brought "within one year from the date on which the violation occurs." *Id.*, at 358.  Title IX, on the other hand, is "silent on the issue" of a claim's accrual. *TRW, Inc. v. Andrews*, 534 U.S. 19, 27 (2001) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)).  In *Rotkiske*, the majority held the discovery rule should not apply as as to undermine unambiguous statutory language regarding the date of accrual.  *Rotkiske* therefore does not apply to the Title IX claims before this Court.

[3] Defendant offers a string cite of cases at pages 7 – 8 and fn 2 of its Motion in which courts held a claim accrued when the abuse occurred.  But not one of these decisions held it could not consider the discovery rule and almost none of the cases even discuss it.  For instance, in *Guy v. Lexington Fayette Urban Cty. Gov't*, 488 F.App'x 9, 11 (6th Cir.) (a case that does discuss the discovery rule) the plaintiffs knew they were injured as they were assaulted by the former head of a summer program for disadvantaged youth, a far cry from Plaintiffs who did not know he was injured because Strauss raped him under the guise of a legitimate medical examination.  The Court also noted Kentucky's reluctance to apply the delayed discovery rule (*id*. at 15); of course, Kentucky law is not at issue here.

Cir. 2001) (emphasis added).[4]  The Sixth Circuit has further held that motions to dismiss on statute of limitations grounds are rarely granted since what each plaintiff knew—and what a reasonable plaintiff should have known—are "factual question[s]" ordinarily "reserved for the jury." *Arctic Express, supra,* at 802.

Ohio State is (and was) a respected university, and Plaintiffs reasonably believed that its team doctor would be, as well.  Plaintiffs had limited experience with doctors, and they were brought up to believe that doctors are trustworthy and do not intentionally harm their patients. Plaintiffs believed that the examinations were the type of thorough examination student athletes must endure.

Defendant knows this, despite its claims in the Motion to the contrary.  As discussed above, Perkins Coie's Report reached the same conclusions finding, among other things, that patients often have "*confusion as to whether sexual abuse, in fact, occurred*" (during a medical examination) and that it was "*essential*" to "consult with suitably qualified medical experts" to determine if Strauss' examinations exceeded medical necessity.  Report at 23 - 24 (emphasis added).  Boiled down, this language from the Perkins Coie report recognizes that sexual assault in a doctor-patient setting is inherently confusing for patients. Contrary to sexual assaults committed by strangers or non-fiduciaries, where there is no expectation of intimate physical contact, a physician's improper physical contact with a trusting patient can easily be concealed or explained away as that physician's standard practice. OSU offers no medical or other credible basis for discounting the opinions and conclusions of its own investigative experts. OSU also offers no reason why Plaintiffs' properly pled allegations should be ignored or deemed unreliable as a matter

---

[4] It is not clear if Defendant asserts when discussing *Anderson* (Motion, at 13) that injury alone triggers the statute of limitations.  Regardless, Sixth Circuit case law is clear that the statute of limitations does not run until the plaintiff discovers the injury and its cause.

of law. If OSU's investigative experts, in the age of the internet, could not differentiate proper from improper medical conduct without consulting medical doctors, it defies common sense for OSU to claim Plaintiffs should have reasonably suspected that Dr. Strauss was lying to them and sexually assaulting them when he described his actions to them as standard medical procedure.

It would also be patently unjust to declare as a matter of law that young college students should have known their doctor violated the standard of care during a medical examination when that same students would be deemed *incompetent* under the Federal Rules of Evidence even to offer testimony on that issue. Should any of Strauss' victims take their claims to trial, rest assured that OSU will file *motions in limine* to prohibit them from telling their juries that Strauss failed to follow medical protocols and ethical standards.

Outside of the context of Title IX, other courts have held that a plaintiff states a timely claim after being subjected to a sexualized medical examination because there is a relationship of trust and confidence between doctors and their patients. What constitutes reasonable reliance in the context of a confidential or fiduciary relationship, such as the doctor-patient relationship, is a far more lenient standard than what constitutes reasonable reliance where there is no inherent right for a plaintiff to assume the other party is acting in the plaintiff's best interest. OSU's argument completely fails to address the fact that persons are entitled to trust doctors and other people who owe thme a duty to act in their best interest. In *Clark v. Abate,* the defendant doctor inserted his ungloved finger into the plaintiff patient's vagina during two separate examinations, and the plaintiff felt uncomfortable and thought the defendant was finding sexual pleasure in the examination, but she could not confirm those feelings. 2013 VT 52 (Vermont Supreme Ct.), at ¶¶ 4, 14. The plaintiff did not realize she was abused (or injured) until media reports surfaced that the defendant doctor had sexually abused another patient. *Id*., at ¶ 19. On these disputed facts,

the court denied defendant's motion for summary judgment. This Court should follow *Clark*, and deny Defendant's Motion on the more lower dismissal standard. *See also Simmons v. United States* 805 F.2d 1363, 1367 (9th Cir. 1986) (psychiatrist malpractice claim accrued when plaintiff discovered that sexual relationship with therapist caused her psychological injuries); *Torres v. Sugar-Salem Sch. Dist.*, No. 4:17-cv-00178, 2019 WL 4784598, at *13 – 14 (D. Idaho Sept. 30, 2019) (summary judgment denied based on court's determination that material dispute exists as to when plaintiff knew or should have known she had a cause of action against the high school therapist who groomed and sexually abused her and the District that employed her since the plaintiff reasonably believed she had a legitimate relationship with the therapist); *Doe v. Cherwith*, 518 N.W.2d 362, 364 (Iowa 1994) (patient's claim that doctor sexually assaulted her during pelvic exam accrued when plaintiff knew or should have known both of the injury and its cause).

In *Jane Doe KG v. Pasadena Hosp. Ass'n,* 2:18-cv-08710-ODW (MAAx), 2020 U.S. Dist. LEXIS 45247, (C.D. Cal. March 16, 2020), at *4, the court considered the claims of three women who indicated, among other things, that the defendant doctor made arousal type sounds as he groped and stroked them, commented on their breasts and told one plaintiff that "her husband must love rubbing his penis there." One plaintiff even called her boyfriend after an examination and said she felt violated. The Sixth Circuit has further held that motions to dismiss on statute of limitations grounds are rarely granted since what each plaintiff knew—and what a reasonable plaintiff should have known—are "factual question[s]" ordinarily "reserved for the jury." *Arctic Express, supra*, at 802. The Sixth Circuit has further held that motions to dismiss on statute of limitations grounds are rarely granted since what each plaintiff knew—and what a reasonable plaintiff should have known—are "factual question[s]" ordinarily "reserved for the jury." *Arctic Express, supra*, at 802. *Id*., at *5. Despite the defendant's sexualized examinations, and the

11

plaintiffs' admissions that something felt wrong, the court found a question of fact as to whether the plaintiffs did not realize they were subjected to a sexual battery until media reports surfaced about this doctor abusing other patients. *Id.*, at *18.

For these reasons, OSU's summary at pages 9 – 10 of its Motion describing each Plaintiff's assault is irrelevant. At the dismissal stage, the Court must construe the Amended Complaint in Plaintiffs' favor and accept as true that Plaintiffs understood and accepted these assaults as legitimate medical care. The Plaintiffs may have expressed feelings of discomfort, shame or other negative emotions (Motion, at 10 – 11), but Dr. Strauss' and OSU's excuses, actions, responses, and deliberate indifference nonetheless caused the Plaintiffs to accept the medical treatments as not out of the ordinary. Am. Compl., at ¶¶ 10, 13.

It is, after all, normal for patients to be naked in front of doctors and for doctors to touch them and accept the doctor's superior knowledge and authority. For example, when a doctor tells a patient with a sore throat that he needs to check the lymph nodes in the patient's genitals, the patient trusts the doctor's experience, training, and knowledge that this is medically appropriate. Numerous factors in this case bolster this result, including a trusted university givings its imprimatur to Dr. Strauss as the official team doctor, Plaintiffs' youth and inexperience with medical care or training, OSU employees casual and often flippant response to concerns all the while continuing to direct and require OSU student-athletes to treat with Dr. Strauss[5].

Defendant cites *Doe v. Pasadena Hosp. Ass'n, Ltd.*, 2020 WL 1529313, decided two weeks later by the same court, but with vastly different facts. Here, plaintiff believed she was abused,

---

[5] Defendant also emphasizes Dr. Strauss' actions outside of the examination room by, for instance, watching OSU student athletes shower. Motion, at 9 – 10. Activities outside of the examination room do not somehow shed light on whether treatment in the examination room is legitimate, especially at the dismissal stage. OSU employees' indifference to such activities and failure to respond to complaints (see, e.g., Am. Compl., at ¶¶ 336, 340, 342) led Plaintiffs to conclude that OSU must not believe that Dr. Strauss' actions outside of the examination room were cause for concern about treatment in the examination room—otherwise, why would Ohio State continue to send its student-athletes to Dr. Strauss for mandatory physicals and other medical care?

lodged a formal complaint, and no one disabused her of that belief. Thus, there were no issue of material fact as to whether the patient believed long prior to filing suit that she had been sexually abused. Regardless, just because one patient sees through her doctor's subterfuge, it does not follow that *all* patients are also required to do so or else their claims go stale. The latter *Pasadena Hosp.* case does not apply here.

Plaintiffs have stated a plausible claim that they could not know they were sexually abused until media reports surfaced in 2019 that Strauss was not a trustworthy doctor and, in fact, abused numerous young student-athletes and others. If, however, this Court is not convinced as to the truth of Plaintiffs' averments, the Court must still find that Plaintiffs state timely claims since they had no way to know of Ohio State's alleged causal connection to his injuries until the Report was released and subsequent media coverage and consultations with attorneys. It is important to remember that Plaintiffs do not bring their claims against Strauss. Their Title IX lawsuits are instead lodged solely against Ohio State. In fact, OSU's argument would lead to the bizarre result of tying the Defendant's accrual date to a non-party's action (Strauss) for which the Defendant cannot be held liable. *See Davis* 526 U.S. at 641 (a recipient of federal funds may only be held directly liable for its own misconduct).

Recently, in a similar group of cases, the Western District of Texas denied motions to dismiss former students' Title IX claims against Baylor University pursuant to the discovery rule and fraudulent concealment doctrines. The court agreed, concluding it was plausible that the claims accrued not at the time each plaintiff was assaulted by a Baylor football player, but ***on the date that an independent external report regarding the University's institutional response to Title IX was released.*** *Lozano v. Baylor Univ.,* 408 F.Supp. 3d 861, 900 – 01 (W.D. Tex. 2019); *see, also*, *Doe I v. Baylor Univ.*, 240 F. Supp.3d 646, 663 (W.D. Tex. 2017) (same). The court found

significant plaintiffs' allegations that, due to active concealment, the pervasive failings of the university were "inherently undiscoverable" at the time of their assaults. *Lozano*, at 861.

Also, in *Board of Ed. of Hononegah Community High School*, 833 F.Supp. 1366, 1376 (N.D. Ill.), the plaintiff was abused by her teachers, knew it was abuse, and her mother reported the abuse at the time to school administrators. However, she did not bring suit until years later, when the media reported on the school's knowledge of the teacher's abuse of other students. The court found her claim timely since a jury could find it "reasonable for plaintiff to believe that the sexual abuse was caused by nothing more than the teacher's improper and self-serving motivation without her having any reason to suspect that the school board or its administrators had been responsible in any way for the teacher's conduct." *Id*. at 1375 – 76. The Court succinctly stated the critical issue: the notice that triggers claim accrual "must not [merely] be harm but of governmental harm." *Id*., at 1376.

Other cases similarly recognize that knowledge of abuse by the government employee does not necessarily mean knowledge by the abuser's employer, much less actions or deliberate indifference leading to the harm. *Sowers*, 694 F.Supp., at 137 – 38 (plaintiff's Section 1983 claim only accrued when the teacher's history of sexual abuse was revealed to the community and she learned the school district fostered an environment of deliberate indifference toward the abuse); *Jameson v. Univ. of Idaho*, No. 18-cv-00451 DCN, 2019 WL 5606828, at * 7 – 8 (D. Idaho Oct. 30, 2019) (Title IX claim did not accrue until University of Idaho issued an "Independent Report:" about its handling of Title IX complaints); *Armstrong v. Lamy*, 938 F.Supp. 1018, 1033 (D. Mass. 1996) (denying summary judgment on statute of limitations grounds where teacher sexually abused student because evidence did not indicate date student knew Municipal Defendant was a proximate cause of injury).

14

Defendant's other arguments fare no better. Defendant notes, for instance, Plaintiff's allegations that complaints and comments about Strauss were "widespread." Motion, at 11. But Plaintiffs allege that such complaints were made by others to OSU, and that Defendant buried the complaints internally, ignored the complaints, and even endorsed Dr. Strauss' methods by telling complainants that was just the way Dr. Strauss did things. Am. Compl., at ¶ 13. Nothing in the Amended Complaint permits the Court to conclude that Plaintiffs, as a matter of law, had a reasonable basis for second-guessing and distrusting the propriety of actions performed by a doctor the law allowed them to trust. And, of course, OSU's continued practice of steering student athletes to Dr. Strauss while protecting and lauding him cemented the Plaintiffs' beliefs that Strauss was above reproach. *See e.g. id.*, at ¶¶ 274, 314.

Defendant also notes that many plaintiffs allege they were not abused at every visit and allege abuse for unrelated conditions. Plaintiffs allege the details as best as they can remember; there is also nothing inherent about some visits being abusive and others not that should have somehow alerted the Plaintiffs that Dr. Strauss' examinations deviated from legitimate medical practice. One could just as easily conclude that if some examinations were appropriate it may bolster the Plaintiff's belief that the doctor-patient relationship was appropriate overall. In turn, Dr. Strauss would tell his patients that what might seem like unrelated treatment was legitimate and necessary[6]. Am. Compl., at ¶ 11.

Defendant's claim that treatment with other doctors in later years (even if relevant, which it is not) should have alerted Plaintiffs that Strauss acted inappropriately is improper at the Rule 12(b)(6) stage of the case. This argument asks the court to consider facts not raised in the

---

[6] Further, not every Plaintiff alleges what Defendant refers to as unrelated treatment. For those few that do, again, Plaintiffs allege that Dr. Strauss explained away any such care by, for example, telling his patients he was checking for hernias, lymph nodes, skin rashes, or STDs all the while assuring them his technique allowed him to perform the best possible examination. Am. Compl., at ¶ 11.

Complaint. It also improperly requires the court to construe the Complaint in favor of the *moving* party that certain actions of Strauss and treatment with other doctors should have caused a reasonable person to be suspicious of a possible injury. The Court is not permitted to draw inferences in Defendant's favor for purposes of the present motion.

Even if the Court somehow finds such arguments about comments, subsequent treatment, or the nature of particular visits relevant to *Strauss*, they are irrelevant to whether Plaintiffs could have known that *Ohio State* knew about Strauss' abuse and acted with deliberate indifference. In short, these facts would not alert the Plaintiffs under any circumstances that they may have a claim against Ohio State.

What a plaintiff knew or should have known is a question for the trier of fact to resolve. *Arctic Express, supra,* at 803. This Court may only grant Ohio State's Motion if it determines at the dismissal stage that Plaintiffs knew or reasonably should have known *both* that they were sexually abused *and* that OSU's deliberate indifference to known, pervasive sexual abuse caused the abuse. As just discussed, Baylor University, the University of Idaho, and numerous school districts have made this same argument and lost. Ohio State should lose, too.

### B. The Amended Complaint's allegations trigger equitable tolling of the statute of limitations.

Fraudulent concealment "toll[s] the running of the applicable limitations period when the defendant takes steps beyond the challenged conduct itself to conceal that conduct from the plaintiff." *Brown v. United States,* No. 2:16-cv-0358, 2017 WL 2378375, at *5 (S.D. Ohio June 1, 2017) (quoting *Gabelli v. SEC*, 133 S.Ct. 1216, 1220 n.2 (2013)). Under Ohio law, which would apply to claims of fraudulent concealment, equitable tolling applies "where there is some conduct of the adverse party…which excludes suspicion and prevents inquiry." *Lutz, supra,* at 474 (6th

Cir. 2013). Over the course of twenty years of employing Dr. Strauss, and continuing after Dr. Strauss left OSU, the University concealed its knowledge of Dr. Strauss' abuse. OSU failed to report the abuse to anyone, failed to discipline Strauss, failed to inform any of the students and continually concealed its knowledge of Dr. Strauss' sexual assaults in the examination room.

Courts repeatedly toll claims against institutions that conceal sexual assault. *See Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 465 (Tenn. 2012) (equitable tolling where plaintiff abused by priest thirty years ago was "misled by the Diocese with regard to the Diocese's knowledge of the [priest's] history and propensity for committing sexual abuse."); *Magnum v. Archdiocese of Phila.*, No. 06-CV-2589, 2006 WL 3359642, at *12 (E.D. Pa. Nov. 17, 2006), *aff'd* 253 F.App'x 224 (3d Cir. 2007) (equitable tolling where plaintiffs in 2002 learned that archdiocese covered up sexual abuse by priests since the 1940s).

In short, "plaintiff must show that the defendant engaged in a course of conduct to conceal evidence of the alleged wrongdoing, and that plaintiff, despite the exercise of due diligence, failed to discover the facts supporting the claim." *Lutz, supra.* Plaintiffs have alleged such facts, and the Report proves them.

### C. Plaintiffs' Claims are Tolled Since July 16, 2018 with the Filing of the First Class Action Complaint Against OSU

Immediately upon learning of OSU's misconduct, the original plaintiff class representatives filed their first Complaint, individually and on behalf of a putative class of survivors, including all Plaintiffs herein on July 16, 2018 (See Doc. 1, Case No. 18-0692). Under *American Pipe,* the operative date of the filing of the Title IX claims for each and every member of the class (named and unnamed) is July 16, 2018, the date of the original class action complaint. The filing tolls the statute of limitations until class certification is denied. *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 554 (1974) (footnote omitted) ("[T]he

commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."); *see also Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 346-47 (1983) (extending doctrine, holding "all members of the putative class [may] file individual actions in the event that class certification is denied, provided ... that those actions are instituted within the time that remains on the limitations period."); *accord In re Vertrue Inc. Mktg. & Sales Practices Litig.,* 719 F.3d 474, 478 (6th Cir. 2013).

It is not entirely clear whether OSU claims it is relevant to its statute of limitations defense that the Plaintiffs in this case filed their lawsuit more than two years after the original class action Complaint. (See, e.g., Motion at 2 (noting Plaintiffs filed nearly three years after first lawsuit was filed)). Plaintiffs did file this lawsuit within two years of the disclosure of the Perkins Coie report and shortly after the first conference with their attorneys. Given these facts, especially at the dismissal stage, it is not relevant that that Plaintiffs filed their lawsuit more than two years after the original complaint. To the extent this Court somehow finds this fact relevant (and determines the statute of limitations commenced at or around the time the first lawsuit was filed against OSU), Plaintiffs reiterate the class action lawsuit tolled Plaintiffs' claims here effective July 16, 2018.

## CONCLUSION

For the foregoing reasons, the Court must deny Defendant's Motion to Dismiss.

Respectfully submitted,

*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500

(937) 435-7511 facsimile
rschulte@yourlegalhelp.com


*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**WRIGHT & SCHULTE, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com

*/s/ Dennis P. Mulvihill*
**Dennis P. Mulvihill (0063896)**
**WRIGHT & SCHULTE, LLC**
23139 Chagrin Blvd., Suite 620
Cleveland, OH 44022
(216) 591-0132
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com
*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the foregoing document upon all counsel of record via the Court's CM/ECF system.

*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com